Patricia C. McARTHUR et al.,
Plaintiffs,

v.

SOUTHERN AIRWAYS, INC., et al.,
Defendants,

Myra Blackburn et al., Inter-
venors-Co-Defendants.

Civ. A. No. C74–1474A.

United States District Court,
N, D. Georgia,
Atlanta Division.

Sept. 24, 1975.

J. R. Goldthwaite, Jr., Adair, Goldthwaite, Stanford & Daniel, Sallie G. Thompson, Atlanta, Ga., for plaintiffs.

Duane C. Aldrich, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., Phil Zerilla, Jr., Zerilla & Zerilla, Memphis, Tenn., for intervenors.

Fisher & Phillips, Atlanta, Ga., for Southern Airways, Inc.

John F. O'Donnell, New York City, for Union.

## FINAL OPINION AND ORDER

MOYE, District Judge.

This action was filed on July 23, 1974, by Patricia C. McArthur and two other female former flight attendants of Southern Airways, Inc., against Southern and the Transport Workers Union and its Airline Stewards and Stewardesses Division which are the collective bargaining representatives of Southern's flight attendants. Initially, the action was filed as a class action on behalf of the three named plaintiffs and all former female flight attendants of Southern who had suffered discrimination in employment by reason of sex in violation of Title VII of the Civil Rights Act of 1964. An agreed extension for filing of answers was obtained. On August 30, 1974, before the defendants had filed any responsive pleadings and prior to sanction of the action by the Court as a class action under F.R.Civ.P. 23, plaintiffs amended the action as of right under Rule 15(a) to eliminate the class action allegations from the complaint. Simultaneously nine additional female former flight attendants sought to intervene as plaintiffs and the intervention was allowed by the Court. Thus, the action was converted from a class action to one

brought personally by multiple plaintiffs before response by the defendants and prior to its sanction as a class action.

On September 9, responsive pleadings were filed by Southern. On that date, plaintiffs, Southern, and the Union defendants presented a consent decree, to which all were in agreement, for approval by the Court. After hearing, the consent decree was approved upon the basis of the facts and contentions then before the Court and was filed. By the terms of the consent decree, all twelve plaintiffs were to be reinstated to employment by Southern on October 1, 1974, with full seniority as of date of hire, and with privileges of choice of flight schedule, choice of base, pay rates, vacation preference and duration, and retirement benefits. Relying upon the consent decree, several of the plaintiffs resigned from other employment and one, Carole Muller, moved her home from Memphis, Tennessee and established residence at the base of her choice at Valparaiso (Eglin Air Force Base), Florida.

Of the twelve plaintiffs, three (McArthur, Eubanks, and Lowe) had exhausted the administrative procedure before the Equal Employment Opportunity Commission and had received suit letters before the action was commenced. Two more (Collard and Prouty) received suit letters before the August 30 amendment and intervention. Mrs. Muller withdrew pending EEOC charges in order to become a plaintiff and take part in the settlement. Six plaintiffs (Holland, Barnwell, Scarboro, Ferrill, Sebo and Nelms) filed no charges with EEOC but they and Muller relied upon the administrative exhaustion and suit letters of the first five as being sufficient compliance with the preliminary statutory procedures.

All of the plaintiffs based their claims of discrimination filed with the EEOC against Southern and the Unions, and in this Court, upon applications for reinstatement to employment filed with Southern at varying dates which are individually discussed *infra*.

On September 20, 1974, Myra Blackburn and other flight attendants then actively employed by Southern moved (1) to intervene on behalf of themselves and all other actively employed flight attendants, and (2) to set aside the consent decree so as to avoid their displacement in seniority by plaintiffs. On September 22, 1974, the Court allowed the intervention, subject to written objections to be subsequently filed by plaintiffs and defendants. The motion to set aside the consent decree was temporarily denied except that the implementation of the seniority provisions therein was enjoined to the extent that such would displace flight attendants then currently employed, pending resolution of the merits of the intervention. After the entry of this partial injunction Southern treated the plaintiffs as new employees for seniority purposes and this resulted in all plaintiffs being assigned by Southern to fly out of its Atlanta base and in six of them (Prouty, Collard, Muller, Holland, Ferrill and Barnwell) incurring away-from-home hotel and meal expense which they would not have incurred if they had been permitted to work at the base of their choice. The objections of the six to this temporary transfer and the resulting personal expenses were disregarded by Southern and they filed motions that Southern and/or Intervenors and the flight attendants represented by Intervenors be required to reimburse them for the extra expense incurred.

The Intervenors contended:

(1) That plaintiffs could not drop the class allegations as a part of an agreement to settle the action with individual plaintiffs.

(2) That each plaintiff must individually exhaust administrative procedures under Title VII and obtain a suit letter before she is entitled to maintain her action.

(3) That five of the plaintiffs (Eubanks, Lowe, Scarboro, Sebo and Nelms) were separated from their employment prior to July 1, 1965, before discrimina-

tion in employment by reason of sex was prohibited by law, and, consequently, that these five employees are not entitled to be employed by Southern except as new employees.

(4) That the seven plaintiffs (McArthur, Collard, Prouty, Muller, Holland, Barnwell and Ferrill) who were separated from employment by Southern after July 1, 1965, even if they are entitled to reinstatement with some seniority, are not entitled to retroactive seniority credit beyond the date of the application of reinstatement of each.

(5) That the Court is without authority to order reinstatement of employees with seniority until vacancies exist, so as not to force present employees to a lower position on the seniority list and possibly force employees at the bottom of the list on layoff.

(6) That Lowe, Prouty and Holland voluntarily terminated for causes other than sex discrimination by Southern.

(7) That the Unions failed to properly represent the interests of present flight attendants in the litigation and that Southern and/or the Unions should be required to pay attorney fees incurred by reason of the intervention.

In January, 1975, while the intervention issues were pending before the Court, Southern notified the Court that business conditions required a cut-back in the number of scheduled flights and a consequent layoff of some 23 flight attendants. Since the Court's interim order of September 22, 1974, deprived plaintiffs of the seniority standing provided in the consent decree, all plaintiffs were laid off during January and February.

Plaintiffs filed a comprehensive response to the motion for intervention, setting forth both contentions of law and fact. Plaintiffs, in addition to opposing each of the contentions of Intervenors, contend:

(1) That Intervenors allege and show no facts which tend to show bad faith,

or invidious motivations on the part of Southern or the Unions in agreeing to the consent decree; that the Company and the Unions have a broad discretion to alter seniority standing of employees in order to reach a good faith settlement of Title VII litigation alleging discrimination, and that absent a showing of bad faith or invidious motivation, Intervenors have no standing to ask that the consent decree be vacated and set aside.

(2) That agreement upon the consent decree was a valid exercise of discretion by Southern and the Unions and must be upheld.

(3) That plaintiffs gave up back pay and other claims to procure agreement upon the consent decree, which must be taken into consideration by the Court.

(4) That except for the intervention, plaintiffs would now be reinstated and working with seniority standing, that equity considers that done which should have been done and that Intervenors must do equity in order to obtain equitable relief; and that, whatever seniority the Court may find the plaintiffs to be entitled, if they had been accorded that seniority at the time of intervention, they would not now be on layoff. They therefore say that equity entitles them to exercise the seniority to which they are entitled even if such results in a displacement of current flight attendants.

(5) That Intervenors and/or Southern should be required to pay additional attorney fees for plaintiffs due to the additional legal services required by the intervention.

Plaintiffs' response to the motion for intervention alleged that the specific cause for the termination of each plaintiff was related to their female sex. These allegations as to each plaintiff were admitted by Southern in its response to the motion to intervene and set aside the decree. The Response of Southern is a part of the record.

After consideration of all the documents which had been filed by all par-

ties to that date, the Court held a conference with counsel on February 19, 1975, to discuss the case and to give counsel benefit of the views of the Court as to tentative legal conclusions which the Court had reached.

At the February 19 conference the Court announced its preliminary legal conclusions that (1) plaintiffs who had been separated from employment prior to July 2, 1965 (the effective date of Title VII), were not entitled to seniority credit for time worked prior to that date, and (2) plaintiffs were not entitled to seniority credit for time between date of separation and date of application for reinstatement. The Court suggested that settlement discussions be held.

The settlement discussions were unsuccessful and on March 24 plaintiffs filed a Statement of Position in which plaintiffs agreed to a modification of the consent decree which would deduct time between date of separation and date of application for reinstatement from the seniority of each plaintiff, provided all other provisions of the consent decree would continue in effect (that is, plaintiffs would be paid on the basis of date of hire seniority and would be permitted to bid a line of flight time at the base of their choice, in return for which plaintiffs had given up all back pay claims against Southern).

Subsequently Southern appeared to agree to these conditions by including them in Proposed Findings of Fact and Conclusions of Law, prepared at the request of the Court. The temporary restraining order, drafted by counsel for Southern and entered by the Court on April 21, provided that reinstated plaintiffs "shall be paid based upon their original date of hire by Southern."

A second conference between the Court and counsel was held on March 31. At that conference the Court instructed that Findings of Fact and Conclusions of Law be prepared.

Following the March 31 conference, plaintiffs Fay Eubanks (Hydrick) and Jo Lowe filed a motion asking the Court to reconsider its preliminary conclusion concerning plaintiffs separated from flight status prior to July, 1965. Both also asserted special equities they believed to exist in their own cases. Mrs. Lowe was terminated in January, 1965, on the eve of the effective date of Title VII and almost a year after the statute was enacted. Mrs. Hydrick was employed by Southern until September 1966, though not on flight status, and she asserted that after July, 1965, but before termination, she requested that she be reinstated as a stewardess.

When, on April 18, at a third conference between the Court and counsel, counsel for Intervenors again urged factual contentions, the Court directed that five of the plaintiffs separated after July 1965, concerning whom no factual issues had been raised, be reinstated on May 1, 1975. The temporary restraining order drafted by Counsel for Southern directed that the five reinstated plaintiffs should be paid "based upon their original date of hire by Southern," thus recognizing continued rights under the consent decree. These five are plaintiffs McArthur, Collard, Muller, Ferrill and Barnwell.

On May 20, 1975, Southern offered the remaining seven plaintiffs employment by recalling them from furlough under Article 13 of the Union Contract. They were recalled without seniority except from October 1, 1974 to date of layoff. Plaintiffs Prouty, Sebo and Nelms accepted the recall. Plaintiffs Hydrick, Holland, Lowe and Scarboro declined to resume work without seniority. There is no contention that this recall, or the refusal thereof, has any effect upon the plaintiffs' claims in this civil action except to the extent that back pay rights, if any, are concerned.

In view of the preliminary conclusions of the Court, the parties stipulated to dates, appearing in Southern's personnel

records of plaintiffs, which are relevant to establishment of plaintiffs' relative seniority standing. The dates stipulated are:

|  | Employed | Date of Separation | Date of Appl. For Reinstatement |
|---|---|---|---|
| Barnwell | 12/1/61 | 3/31/68 | 8/19/74 |
| Collard | 3/15/65 | 3/7/68 | ? |
| Eubanks | 12/27/50 | 9/17/62 (transferred to reservations) | 6/6/73 |
| Ferrill | 2/17/64 | 1/30/68 | 8/29/74 |
| Holland | 2/17/64 | 4/30/70 | 8/29/74 |
| Lowe | 8/19/63 | 1/14/65 | 6/6/73 |
| McArthur | 3/4/68 | 10/15/70 | ? |
| Muller | 10/1/60 | 5/19/69 | 2/15/74 |
| Nelms | 12/27/50 | 5/31/52 | 8/29/73 |
| Prouty | 8/2/65 | 3/1/72 | 11/1/73 |
| Scarboro | 2/16/51 | 4/26/62 | 8/20/74 |
| Sebo | 9/17/62 | 5/15/64 | 8/29/74 |

The personnel record shows that Mrs. Collard applied for reinstatement in writing on September 3, 1973, and she was temporarily reinstated on the basis of that date; however, she requests that a 1969 date be established as the date of her application for reinstatement for seniority purposes because she allegedly sought reinstatement in 1969.

Mrs. McArthur's file shows that she applied for reinstatement in writing on June 6, 1973. She testified that she was terminated under protest and that she applied for reinstatement on or about March 1, 1971, in October, 1972, and in March or April, 1973. She was reinstated by the temporary restraining order on the basis of March 15, 1972, but that arbitrary date was the result of a non-prejudicial compromise agreement between counsel.

Thus, plaintiffs fall into four groups or classes:

(1) Those terminated before July 2, 1965—Nelms, Scarboro and Sebo;

(2) Those terminated (from flight status) before July 2, 1965, but who claim that special equities exist in their cases— Hydrick (Eubanks) and Lowe;

(3) Those terminated after July 2, 1965, concerning whom Intervenors raised no issue of fact—Barnwell, Collard, Ferrill, McArthur and Muller (heretofore reinstated by temporary restraining order); and

(4) Those terminated after July 2, 1965, as to whom Intrevenors questioned the cause for separation (Holland and Prouty).

Southern opposed the intervention and the consent decree until June 20, 1975, the Friday before trial was to begin on Monday, June 23. On the Friday before trial, Southern's counsel announced that Southern had decided to oppose the entire case as to all plaintiffs for reasons set forth in a motion for leave to amend answer.

Plaintiffs urge that Southern, by entering into a settlemen agreement with plaintiffs upon which plaintiffs relied and changed their positions, waived any right Southern may have had to oppose plaintiffs' claims to reinstatement with seniority and that Southern is estopped, in equity, from repudiating all it has done and said in this case.

Plaintiffs contend, in that connection, that there are twelve individual plaintiffs

in this case who executed twelve individual releases of their claims and, hence, twelve individual settlemen agreements. Each plaintiff, individually, requests that her settlement agreement, modified as to seniority as agreed by plaintiffs in their statement of position filed March 24, be upheld.

Plaintiffs say that it is not a legal necessity, in equity, that all twelve settlement agreements be set aside if the Court should decide that one or other of the plaintiffs is not entitled to reinstatement with seniority and that each case can, and should be, dealt with individually as the law and equity requires.

## II

### Conclusions of Fact

A. *Discriminatory Policies of Southern*

1. Prohibition against marriage of Stewardesses.—The personnel records of Lowe, Nelms, Scarboro and Sebo state that each "resigned to be married" or "resigning to be married." Lowe, Nelms and Sebo testified without contradiction that the early rules of the Company (before July 1, 1967) required stewardesses to resign if they married; and the Court so finds. Each claims that this rule caused their termination.

2. Prohibition against Stewardesses marrying other employees.—The pre-July, 1967, rule was relaxed in the second contract with the Union effective July 1, 1967. From July 1, 1967 until January 1, 1972 (while the second and third Union contracts were in effect) the rule was: "if a stewardess marries another employee, she will voluntarily resign her employment with the Company." Barnwell, Ferrill, Holland and McArthur, all of whom intermarried with the protected class of employees (pilots) assert that they were required to resign because of this rule.

3. Age.—Up until at least July 1, 1967, and possibly until July 1, 1969, a "stewardess" could not continue to work in that capacity after she reached the age of 35. This rule was first applied September 17, 1962, when Mrs. Hydrick, then Fay Mathews, was terminated from flight status and transferred to the reservations department.

4. Pregnancy.—The second ' Union contract with Southern, in effect from July 1, 1967 to July 1, 1969, provided that "if a stewardess * * * becomes pregnant, she will voluntarily resign her employment with the Company." This rule required the resignation of Nancy Collard on March 7, 1968, and of Carole Muller on May 19, 1969.

5. Cosmetic Weight Regulations.— According to Stipulation No. 2, Appendix C, "Stewardesses who were employed prior to September 1, 1970, will be under the provisions of the Company weight program in effect prior to September 1, 1970." According to Appendix D (Stipulation No. 2), "the weight standard in effect prior to September 1, 1970, permitted [stewardesses] a variance of plus or minus five pounds from hiring weight." The pregnancy leave of absence granted to Ann Prouty provided that "you must return to work *no later* than March 1, 1972," and requested a thirty day notice before she planned to return. Prouty asserts that she was caught on the horns of this dilemma (30 pounds over weight and March 1, 1972, at hand) and that the notice of termination she filed on February 20, 1972, was involuntary.

B. *Facts Concerning Seniority System*

All flight attendants of Southern are listed on a "seniority list" in order of the length of their relative credited service with the Company. The non-supervisory flight attendants on the list do not hold different jobs, as such. They all hold the same job—that of non-supervisory flight attendant.

Flights are rescheduled by Southern each month, to originate at four different bases—Atlanta, Memphis, New Orleans and Valparaiso (Eglin A.F.B.). Consequently, some flight attendant jobs (lines-of-time) are based at each base and a list of non-supervisory flight at-

tendants in order of base seniority is kept at each base. Each month all jobs (lines-of-time) at each base for the following month are posted for claim (bid) by the flight attendants at that base who express their preference in order of seniority. The schedules (lines-of-time) are not the same from one month to the next. Personal circumstances of each flight attendant, and hence personal preference of working schedules, change from time-to-time.

In addition to scheduled flying lines of time, Southern schedules a number of "reserve" positions for each month, specifying duty days and days off during the month. "Reserves" must stand-by on their duty days and be available in the event they are needed to fly.

Lines-of-time and reserve positions are bid by flight attendants on the basis of their various personal preferences. Flight attendants are paid at a base rate which varies upward by length of seniority and, in addition, receive hourly flight pay for all hours flown in excess of sixty per month.

Thus, no flight attendant holds a fixed position, but each has a choice of a different flight schedule each month. Consequently, adding employees does not displace any employee from any particular job. If a shortage of jobs exists, the least senior (last employed) flight attendant may be subjected to downgrading to reserve status or to furlough.

After plaintiffs were reinstated on October 1, 1974, Southern added new lines of time and hired and trained more flight attendants in November, 1974. These new junior attendants were laid off, along with plaintiffs, in December, 1974, and January, 1975. In May, Southern recalled all plaintiffs then remaining on layoff to work with only 3 or 4 months seniority, but four plaintiffs (Hydrick, Lowe, Holland and Scarboro) declined to work with only 3 or 4 months seniority and chose to rely upon rights asserted in this action under the settlement agreement with Southern. Hence, some attendants hired after Oc-

tober 1, 1974, were recalled and are working. In addition, attrition is high among flight attendants, averaging one or two attendants per month at the smaller bases, two at New Orleans, and more in Atlanta. Dispersal of plaintiffs among the four bases would also tend to minimize the effect upon other attendants of plaintiffs reinstatement with seniority.

C. *Facts Concerning Individual Plaintiffs*

(1) *Mrs. Nelms, Mrs. Sebo and Mrs. Scarboro*

Mary Lou Nelms, was employed December 27, 1950, and was in Southern's first class of stewardesses with Fay Mathews (Hydrick). She worked until May 31, 1952, when she (her personnel record states) "resigned to be married." (Plf. Exh. 13, p. 3.) Thereafter she worked for Southern as a station agent from September, 1952 through February 1953, when she resigned to take another job. Through the years she has worked at other jobs, between the births of three children, and she resigned from another job to return to work for Southern under the consent decree. She applied for reinstatement through counsel for plaintiffs on August 29, 1974. She accepted recall to Southern, without seniority or benefit of consent decree rights, on June 1, 1975, because she needed to work and her children urged her to do so.

Dorothy Bradley Sebo was employed on September 17, 1962, and flew until May 15, 1964, when she gave notice under Southern's rule that she was "resigning to be married". Mrs. Sebo made application for reinstatement through counsel for plaintiffs on August 29, 1974. In order to return to work for Southern, Mrs. Sebo resigned from a responsible job as a loan officer for a federal savings and loan association, where she had worked for several years and was earning over $8,000.00 per year and to which she cannot return. Mrs. Sebo accepted recall to work by Southern without se-

niority and without benefit of consent decree rights on June 1, 1975, because she had to have employment.

June Childres Scarboro was employed February 16, 1961 and "resigned to be married" April 26, 1962. She applied for reinstatement through counsel for plaintiffs on August 20, 1974. In order to return to work for Southern under the consent decree, Mrs. Scarboro resigned from a responsible job as a passenger agent with Eastern Air Lines where she was paid approximately $11,000.00 per year, and as which she had not, at the time of trial, been able to obtain reemployment.

There is no contested issue of fact relative to the cases of Mrs. Nelms, Mrs. Sebo and Mrs. Scarboro.

### (2) *Mrs. Hydrick and Mrs. Lowe*

Mrs. Fay Mathews Hydrick was employed on December 27, 1950 in the first class of Southern stewardesses. Her flight status was terminated on September 17, 1962, because of her age (she was 37 when Southern adopted the age 35 rule for stewardesses) and was transferred to the reservations department across the street from Southern's executive offices. She worked in reservations until August 31, 1966, when she resigned to be married. Mrs. Hydrick testified that she was not happy in her work in reservations during the years between 1962 and 1966, and that on several occasions she requested Everett Martin, Personnel Manager, and later Personnel Vice-President of Southern, to permit her to return to work as a stewardess. She asserts that one or more of these requests was made after July 2, 1965, but Mr. Martin, no longer employed by Southern, did not recall the conversations with Mrs. Hydrick.

Mrs. Hydrick gave up a responsible job in the crew scheduling department of Delta Air Lines in order to return to work under the consent decree. She applied for reinstatement in writing on June 6, 1973.

Jo Hawk Lowe was employed by Southern on August 19, 1963. On January 14, 1965, she notified Southern that she was "resigning to be married" as required by Southern's rules. Mrs. Lowe married a Southern employee, then a mechanic, now a pilot. Mrs. Lowe was planning to marry (and did marry) in March, 1965, but because Southern's rules required her to resign upon marriage, she resigned two months early in order to accept a job offered to her by another employer for whom she could work while married. Mrs. Lowe applied for reinstatement in writing on June 6, 1973, and exhausted her EEOC remedy. She was one of the original plaintiffs in this case.

Intervenors assert that Mrs. Lowe resigned early because she did not like her job and in order to accept other employment. Mrs. Lowe testified that she, like most other stewardesses, did not like to fly reserve, but that she had accrued enough seniority to bid a schedule line of time the month before she resigned, and that she enjoyed flying a regular schedule. Her personnel record, however, states explicitly that she was "resigning to be married".

### (3) *Ms. McArthur, Collard, Muller, Barnwell and Ferrill*

These five plaintiffs have already been reinstated with seniority pursuant to the Court's temporary restraining order. There are no issues of fact pertaining to their cases except (1) the dates to be established for computing Mrs. McArthur's and Mrs. Collard's seniority, and (2) whether seniority credit is to be allowed plaintiffs for pregnancy and adoption leaves of absence. These factors relate to relative seniority standing. Plaintiffs assert that the Court should allow pregnancy leave credit to all plaintiffs' seniority as well as to all other stewardesses, since it was plaintiffs who obtained this benefit for all other stewardesses.

Southern admits and Intervenors do not challenge the correctness of the per-

sonnel records of these five employees which show that McArthur "resigned to be married"; Collard "resigned due to pregnancy"; Barnwell "resigned due to marrying a current employee (pilot)"; Ferrill "resigned to be married"; and Muller "resigned due to pregnancy". Both Mrs. McArthur and Mrs. Collard exhausted their EEOC remedies. Mrs. Muller also filed charges on January 17, 1974, but withdrew them in order to return to work under the consent decree.

Mrs. Muller's resignation due to pregnancy on May 19, 1969, came just two months before the pregnancy rule was changed on July 1, 1969. She requested Martha Bost as representative of the Union to get her resignation converted to a leave of absence, but Mrs. Bost told her that she did not have a valid grievance (that the rule change was not retroactive).

Mrs. Collard applied for non-flying work with Southern in Memphis in 1969, some months after her resignation in March, 1968, due to pregnancy. She was not hired because there were no vacancies in such work in Memphis.

It is undisputed that Mrs. McArthur resigned on October 15, 1970, only upon actual threat of discharge. The following year, as soon as she heard that Southern's marriage rule was to be changed, she applied for reinstatement, but was told that the change in rules would not be retroactive. Thereafter, she sought reinstatement and finally exhausted her administrative remedies before filing suit.

### (4) *Mrs. Holland and Mrs. Prouty*

Charlotte Millwood Holland was employed by Southern on February 17, 1964. She and Capt. John E. Holland, senior pilot at Southern's New Orleans base, were married on December 29, 1969. Mrs. Holland continued to work in violation of Southern's rule which required her, as a stewardess, to resign. Mrs. Kirchberg, New Orleans Chief Stewardess, testified that Southern's stewardess supervisors were instructed by Southern to interrogate stewardesses concerning whom there was cause for suspicion of marriage (such as cohabitation or reports thereof) and to enforce the no-marriage rule. Mrs. Holland testified, and Mrs. Barnwell (who had married a Southern pilot but continued working) testified, that Mrs. Barnwell had told Mrs. Holland how she had been interrogated by her Chief Stewardess until she resigned in fear for her husband's job. Mrs. Holland testified that she resigned on April 30, 1970 because she and Captain Holland were afraid for Captain Holland's job and because they did not like to keep their marriage secret and have their friends think they were living together out of wedlock. Mrs. Ferrill confirmed this testimony of Mrs. Holland.

Mrs. Kirchberg testified that Mrs. Holland said that she was resigning to go back to school. However, Mrs. Holland testified to the contrary. Plaintiffs' Exhibit 12, p. 11 shows that Mrs. Holland did not apply for admission to school until over two years following her resignation had passed. It would not be necesary for a stewardess flying a schedule line of time, like Mrs. Holland, to resign from her job to attend school part time, as Mrs. Holland did in 1973. Southern has admitted throughout these proceedings that Mrs. Holland resigned because of the no-marriage rule and there is no evidence to the contrary.

Mrs. Holland applied for reinstatement through counsel for plaintiffs on August 29, 1974. Her reinstatement with seniority will displace no flight attendant employed in October, 1974, from flight status, because of resignations at the New Orleans base.

Ann Norfleet Prouty was employed as a stewardess from August 2, 1965 to March 1, 1971, when she was required to take a twelve months pregnancy leave of absence by Southern's rules. Her leave of absence stated: "As you know *you must* return to work *no later than* March 1, 1972. We would appreciate at least

a thirty day notice before you plan to return . . ." (Plf. Exh. 6, p. 16).

At the time Southern had cosmetic weight regulations for stewardesses which required Mrs. Prouty to maintain her weight within "plus or minus five pounds from hiring weight". During her pregnancy Mrs. Prouty gained weight and during a visit to the Memphis base in December, 1971, or January, 1972, other stewardesses teased her about her weight and about being unable to get into her uniform to return to work. Mrs. Prouty testified that this was very humiliating and embarrassing to her. While on this visit, Chief Stewardess Jane Crispen saw Mrs. Prouty but did not speak to Prouty.

In December, Mrs. Crispen, Memphis Chief Stewardess, talked to Mrs. Prouty on the telephone and reminded Mrs. Prouty that she must give 30 days notice of her intention to return to work. At that time Prouty inquired about other employment with Southern but expressed her intention to return to work as a stewardess in Memphis if she could not get work with Southern in Muscle Shoals. On December 28, 1971, Mrs. Prouty testified that she posted a letter to Owen McRee, Personnel Vice President of Southern, announcing her intention to return to work, if other work, concerning which she inquired, was unavailable. A copy of that letter is contained in Mrs. Prouty's personnel file, but the original is not in the file. Mrs. Prouty testified she mailed the letter. Mrs. Crispen was familiar with the letter and recognized it as a statement of the intentions expressed by Prouty in their December conversation. Mr. McRee said he "did not recall" ever having seen the original of the letter.

In mid February Prouty remained twenty-five pounds overweight but her leave of absence was to expire on March 1. On Feburary 20, Prouty wrote another letter to Mr. McRee, and notified him of the termination of her employment. She said "I only wish there was some way I could continue with South-ern, as my years with the company have been most rewarding".

Prouty was married in 1970 and she attempted on several occasions to get a non-flying job. She wrote in July 1970 that she intended to get married and it would be necessary for her to quit flying at that time and move to Muscle Shoals. She wanted to work in the station there. Southern responded through Personnel Manager Messer that Prouty would be considered for such a job if anything developed at that station. Prouty admitted that she could not have performed the duties of a station agent at Muscle Shoals which included the loading and unloading of baggage. McRee testified that the jobs at that station at that time would have required such work and that there were no such jobs as merely ticket counter jobs at a small station like Muscle Shoals. Prouty considered Mr. Messer's response to her to leave the "door open" as to the possibility of a job in Muscle Shoals. Thereafter she continued to fly until she went on pregnancy leave in March of 1971. In her letter to McRee in December of 1971 she again stated her strong preferences for a non-flying job. She never filed a formal application for any particular job and finally sent in her resignation letter in February of 1972, again asking for consideration at the Muscle Shoals station.

### III

### CONCLUSIONS

A. *Intervention And Class Action Rulings*

1. Intervenors are not appropriately members of the class of stewardesses sought to be represented by McArthur, et al, in the original complaint because Intervenors do not claim to have suffered employment discrimination by reason of their sex. Intervenors therefore had no right to notice prior to amendment of the action to delete the class aspects from the action.

■ 2. Intervenors, and persons who as of September 9, 1974, were employed by Southern Airways, Inc., as flight attendants, are an appropriate class under Rule 23(b)(1), (2). The members of that group are so numerous that joinder of all of them is impracticable in that they number over 100 persons. The questions common to the class are whether rights of flight attendants then employed were infringed by the consent decree, and if so, to what extent, and what consideration or protection of the interest of the Intervenors' class should be afforded in framing a final decree. The claims of the named Intervenors are typical of their class in that they seek to protect class seniority rights and interests from encroachment by plaintiffs, who were restored to active service by the consent decree with Southern with seniority dating from their original employment. Intervenors have fairly, adequately and vigorously protected the interests of their class. Prosecution of the interests of the class by Intervenors will, as a practical matter, be dispositive of the claims of other members of that class who are not personally parties made hereto and will adequately protect the interests of those who are not personally made parties. Further, plaintiffs and defendants have acted on grounds generally applicable to Intervenors' class and final injunctive and declaratory relief applicable to the class as a whole is appropriate. Intervenors represent a class which is appropriate under Rule 23(a), (b)(1), (2), F.R.C.P., but no notice to the members of that class is required by Rule 23.

■ 3. By the consent decree, plaintiffs were integrated into the seniority list and the relative seniority standing of some members of Intervenors' class was affected. Seniority is a valuable right which a Court sitting in equity may protect from improper invasion. While an employer and a union have a broad discretion to devise means to settle Title VII litigation and for that purpose have authority to vary seniority standing of employees, Intervenors nevertheless have standing to intervene on behalf of themselves and their class. They have this standing, irrespective of the good faith in which Southern and the Unions devised settlement provisions. Therefore, even though the Court specifically finds that Southern and the Unions acted in good faith and without invidious motivations in agreeing upon the provisions of the consent decree, the intervention should be allowed and the objections overruled.

■ 4. By F.R.C.P. Rule 15 plaintiffs were entitled, as of right, to amend their action to delete the class aspects therefrom and to convert the action into one by multiple individual plaintiffs prior to answer or response by defendants and prior to sanction of the action by the Court as a class action under Rule 23. Furthermore, plaintiffs and other discriminatees are not so sufficiently numerous as to fulfill the requirements of Rule 23. Cf., *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213 (D.C.Colo. 1973), 466 F.2d 1374 (10th Cir. 1972).

B. *Policy of the Law and Authority of the Court*

1. *Policy of the Law.* It is the policy of federal law, expressed in Title VII, to eliminate the effects of discrimination in employment. The same Act applies to discrimination arising from race, sex, religion and national origin. Hence, all of the cases setting forth the policy of the law in race discrimination cases are applicable in sex discrimination cases.

2. *Duty and Authority of the Court in Sex Discrimination Cases*

Under the law, this Court can reinstate emloyees and can adjust relative seniority standing of employees, even though some employees may be disadvantaged. The command of the Act to the Courts is to do what is right and equitable to eliminate the present effects of past discrimination in the context of the cases before them; but that command is also a limitation on this

Court's authority, and the Court cannot give plaintiffs rights to which they are not legally and equitably entitled.

■■ 3. *Sex Discrimination Defined*—An employer cannot have one policy concerning the hiring and retention in employment of male employees and maintain a separate and different policy for female employees. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613; *Lansdale v. United Air Line Pilots Association International,* 430 F.2d 1341 (5th Cir. 1970). Employment rules concerning age, marriage and pregnancy, and cosmetic weight regulations adversely applicable, expressly or by necessary implication, to female employees in different measure than to males, are *per se* discriminatory. See *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (7th Cir. 1971); *Gerstle, supra; Air Line Stewards & Stewardesses Assn. v. American Airlines, Inc.*, 490 F.2d 636 (7th Cir. 1973); *Pond v. Braniff Airways, Inc.*, 500 F.2d 161 (5th Cir. 1974) (height restriction); *Healen v. Eastern Airlines*, (N.D.Ga.1973, J. Henderson) (pregnancy policies); *Laffey v. Northwest Airlines, Inc.*, 374 F.Supp. 1382 (D.D.C.1974) (cosmetic weight regulations); *Gerdom v. Continental Air Lines, Inc.* (C.D.Cal.1974) (cosmetic weight regulations).

■ 4. *Title VII Policy Strongly Favors the Private Settlement of Cases*—As *Bowe v. Colgate Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1969), points out, one of the prime reasons Congress provided for a pre-judicial administrative procedure and for the filing of charges, was to give the parties an opportunity through conciliation and/or negotiations to settle cases.

In *Culpepper v. Reynolds Metals Co.*, 421 F.2d 888, 891 (5th Cir. 1970), the Court said:

> This court has held many times that Title VII should receive a liberal construction while at all times bearing in mind that the central theme of Title VII is "private settlement" as

an effective end to employment discrimination. In *Oatis v. Crown Zellerbach* (5th Cir. 1968) 398 F.2d 496, this court held that:

> "It is thus clear that there is *great emphasis in Title VII on private settlement and the elimination of unfair practice without litigation.*"

This view was again voiced in *Jenkins v. United Gas Corporation* (5th Cir. 1969) 400 F.2d 28, where this court stated that:

> " * * * EEOC whose function is to effectuate the *Act's policy of voluntary conference, persuasion and conciliation as the principal tools of enforcement.*" [Emphasis by the Court].

Private settlements therefore should be encouraged and upheld to the fullest extent practicable by the courts.

Settlements made by private parties are entitled to the same dignity as those made by the Attorney General because:

> The suit is * * * more than a private claim by the employee seeking the particular job * * * that individual, often obscure, takes on the mantle of sovereign. * * * If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority.

*Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); quoted in *Jenkins v. United Gas Corp.*, 400 F.2d 28, 32 (5th Cir. 1968); *Culpepper v. Reynolds Metals*, 421 F.2d 888, 894 (5th Cir. 1970).

Private parties are entitled to seek, and may negotiate, relief just as extensive as may the Attorney General. *Oatis v. Crown Zellerbach Corp.*, 398 F. 2d 496, 498 (5th Cir. 1965); *Culpepper v. Reynolds Metals, supra,* at 893, *Johnson v. Goodyear*, 491 F.2d 1364, 1375 (5th Cir. 1974); *Drew v. Liberty Mutual,* 480 F.2d 69 (5th Cir. 1973); *Pettway v. American Cast Iron Pipe Co.*, 494 F. 2d 211 (5th Cir. 1974).

■ 5. *Discretion of the Union*—As bargaining representative for employees unions have a broad discretion to alter or amend a seniority system even though the alteration may adversely affect some employees.

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

*Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048. Accord: *Humphrey v. Moore,* 375 U.S. 335, 348, 84 S.Ct. 363, 11 L.Ed.2d 370; *Steele v. Louisville and Nashville R. Co.,* 323 U.S. 192, 200, 65 S.Ct. 226, 89 L.Ed. 173 (under the Railway Labor Act, as here).

■ The party attacking the alteration of a seniority system by a union has the burden of demonstrating bad faith, malice or other invidious motivations. *Humphrey v. Moore, supra.* See also, *Vaca v. Sipes,* 386 U.S. 171, 87 S. Ct. 903, 17 L.Ed.2d 842 (1967).

In *Bowe* (first decision), *supra,* the Seventh Circuit held (416 F.2d, at 719);

> Colgate also argued that there was a failure of necessary joinder in the actions below as none of its male employees were made parties to the action. The issue is frivolous. The Union was made a party and its duty was to represent the male employees as well as the female employees. There is nothing in the law which precluded the Union from recognizing the injustice done to a substantial minority of its members and from moving to correct it. This is an internal union matter which had to be resolved with-

in the Union and did not require intervention by the employer. See *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

Three years later in *Air Line Stewards and Stewardesses Association, Local 550 v. American Airlines, Inc.,* 490 F.2d 636 (7th Cir. 1973), the *same* local union which is defendant in this case, negotiated a settlement which gave the discriminatee stewardesses (like plaintiffs here) a right to reinstatement with *less than* full seniority. The Seventh Circuit, which had already held (*Spogis, supra*) that full seniority was the proper remedy, cited the *Gerstle* decision with approval and held that the union, in agreeing to less than full seniority had demonstrated a conflict of interest between its status as bargaining representative of currently employed stewardesses (majority group) and its status as representative of the class (discharged stewardesses) of plaintiffs (minority group). The Court therefore vacated the decree approving the settlement and directed that a new representative of the class of discharged stewardesses should be appointed (490 F.2d at 643) to replace ALSSA. The Court did not prohibit ALSSA from representing the interests of currently employed stewardesses in the litigation, thus continuing to recognize as in *Bowe,* the function of a union as bargaining representative. That case does not undermine, but upholds, the status of a union as the representative of current employees.

C. *Status of the Case and Equitable Considerations*

1. *Duty and Discretion Encompassed in the Settlement*—Employers and unions are very cognizant of their responsibilities *and liabilities* under Title VII. Cf., *Johnson v. Goodyear, supra.* The defendant unions were involved in much of the litigation cited above.

Counsel for all of the parties to this case have been required to devote a substantial portion of their time in recent years to equal employment problems and litigation.

It was with full knowledge of the above decisions as to the policy of the law and of the heavy burden of time and expense which equal employment litigation involves that counsel negotiated the settlement in this case. They undertook to effect a compromise which would restore plaintiffs to their "rightful place" and be acceptable to all plaintiffs, Company and current employees. At the time Southern needed more flight attendants and the Company and the Unions did not believe that the reinstatement of twelve stewardesses with seniority would work a substantial or permanent disadvantage to any employee.

In arriving at a settlement, counsel knew the presumptions in the law which favor the elimination of the present effects of past discrimination. Without a settlement the parties would have had to deal with troublous problems in individual back pay claims. *Johnson v. Goodyear* and *Landsdale v. United Airlines, supra.* Plaintiffs agreed to give up back pay claims in exchange for a prompt return to work with seniority rights, choice of base and base pay based upon date of hire.

■ Unions and employers have an affirmative duty to eliminate the present effects of past discrimination. (*Bowe,* first decision, *supra,* at 719) and the price for failing to take effective and adequate measure to do so is high. *Carey v. Greyhound Bus Co., Inc.,* 500 F. 2d 1372 (5 Cir. 1974); *Johnson v. Goodyear, supra; Pettway, supra.*

■ Under these circumstances it cannot be held that the Company and the Union acted in bad faith or for discriminatory or invidious motivations in agreeing that plaintiffs should be reinstated with full seniority. Such was done in accordance with the policy of the law that private settlements to eliminate the present effects of past discrimination should be reached without litigation wherever possible.

■ 2. *Posture of the Case*—This case was filed in July, 1974. Thereafter settlement negotiations were commenced and concluded before the Court became actively engaged in it. The settlement was an accomplished fact, the complaint had been amended to delete the class action, and all plaintiffs had intervened as parties and had executed releases, ready for delivery, when the consent decree, which contained the settlement agreement, was presented to the Court for approval on September 9.

As soon as the decree was approved:

(1) The releases were delivered;

(2) All of the plaintiffs, except two or three who were unemployed, gave notice of resignation from their jobs, which in most cases were very responsible and remunerative positions;

(3) Muller rented a house near Eglin, AFB, and moved her family;

(4) Southern postponed plans to hire new stewardesses and scheduled reorientation training for plaintiffs.

In reliance upon the settlement and their mutual promises, both Southern and plaintiffs changed their positions beyond retrieve.

Plaintiffs expressly gave up, *as benefits to Southern,* all claims for back pay and all claims for any other relief than that contained in Southern's promises. In return, plaintiffs received in *separate promises,* full seniority (2), full pay (5), full vacation (6), full retirement (7), week-ends off until flying a schedule lines of time (8 and 9) and last, but not least, choice of base (9).

That *entire* settlement was permitted to remain in effect by the Court after intervention and was "not stayed and *shall be implemented except* to the extent that the seniority status of presently employed flight attendants is displaced thereby." (Order of September 22, 1974.) This Court has passed no order derogatory of the September 22 Order.

The Court concludes that a settlement of the case was made and is in effect, and that the only issue which was opened by the Court for decision is the relative seniority standing of plaintiffs. Insofar as Southern is concerned, the

company is bound by the consent decree "except to the extent that the seniority status of presently employed flight attendants is displaced thereby."

Throughout this case in conference with the Court, Southern's counsel have argued in support of the settlement. The Court asked counsel for Southern to draft a proposed decree which would uphold the settlement in large measure, except for relative seniority standing. Counsel for plaintiffs suggested that the proposed decree contain provisions which would uphold the decree, including recognition that plaintiffs gave up back pay claims in return for preferred pay status, and Southern's counsel agreed and put that provision in the proposed decree. In the drafting of the temporary restraining order, counsel for plaintiffs suggested that the order should contain recognition that the consent decree was still in effect, except for seniority, and Southern's counsel agreed and included a provision in the temporary order that the five plaintiffs reinstated would be paid as provided in the consent decree— based upon date of hire.

3. *Waiver by Southern*—Thus, until Friday, June 20, Southern admitted, and its counsel argued in the presence of the Court, that discriminatory employment policies had caused the termination of each of the plaintiffs. On June 20, Southern's counsel announced that Southern had decided, for reasons set forth in a motion for leave to amend answer, to litigate the cause of discharge with each plaintiff, and to contend that time limitations and laches bar reinstatement of the plaintiffs.

He who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. *Dickerson v. Colgrove*, 100 U.S. 578, 25 L.Ed. 618 (1879).

One who, by his acts or representations or by his silence when he ought to speak, intentionally or through culp-

able negligence induces another to believe certain facts to exist, and the latter rightfully acts on such a belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts, is thereby conclusively estopped from interposing such denial. *Kirk v. Hamilton*, 102 U.S. 68, 26 L.Ed. 79 (1880).

Equitable estoppel arises from the conduct of a party, using the word "conduct" in its broadest meaning as including his spoken words, his positive acts, and his silence where there is a duty to speak, and proceeds on the consideration that the author of a misfortune shall not himself escape the consequences and cast the burden on another. Accordingly, it holds a person to a representation made or position assumed where otherwise inequitable consequences would result to another who, having the right to do so, under all the circumstances of the case, has in good faith relied thereon and been misled, to his injury. 28 Am.Jur.2d 641, Estoppel and Waiver, Sec. 35.

By its conduct in entering into the settlement and consent decree, which caused plaintiffs to change their position, and in making representations to the Court, Southern is now estopped to repudiate the settlement and consent decree. Furthermore, by the same acts, Southern waived any rights it may have had to contend that plaintiffs were not terminated by reason of its discriminatory employment policies and to urge time limitations and laches against plaintiffs.

In *Chambers & Company v. Equitable Life Assurance Soc.*, 224 F.2d 338, 345 (5th Cir. 1955), the Fifth Circuit said:

A waiver is an intentional relinquishment or abandonment of a known right or privilege. The right, privilege or advantage allegedly waived must be in existence and be known to exist by the party possessing it, and this party must intentionally and voluntarily re-

linquish such right, advantage or benefit. Moreover, a waiver must be supported by an agreement founded on a valuable consideration.

To the same effect, see *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Phillips v. Lagaly,* 214 F.2d 527 (10th Cir. 1954).

All of the essential elements of a waiver required by the Fifth Circuit are present here. Southern intentionally waived whatever defenses it had to the reinstatement of plaintiffs when it agreed to settle this case and received consideration therefor.

■ 4. *Standing of Company and Intervenors to Raise Issues*—As stated, Southern waived its right to now urge that plaintiffs were not terminated for discriminatory reasons, that charges were not timely filed with reference to an act of discrimination, that a claim for retroactive seniority cannot be based upon an application for reinstatement and that plaintiffs are not now employees of Southern. Plaintiffs are entitled to the benefit of their bargain with Southern to the full extent that that bargain does not improperly and inequitably deprive intervenors and their class of seniority standing. Thus, Intervenors are permitted to raise those issues of law and fact which relate to relative seniority standing and those issues will be decided by the Court.

5. *Status of Case, Continued*—On March 24, 1975, after the Court had orally announced its preliminary opinions to counsel on February 19 and after further settlement negotiations were unsuccessful, plaintiffs filed a Statement of Position which reflects their contention that the settlement of the case continued in effect and which, while insisting that all plaintiffs are entitled to return to work with seniority, recognizes the equities which concerned the Court on February 19 and agreed to compromise on their seniority status as had been suggested by the Court. Plaintiffs in their offer to compromise

insisted that Intervenors must also do equity to plaintiffs.

Plaintiffs therefore recognize the authority of the Court to supervise the settlement and to do equity to all parties. But plaintiffs insist that the Court must deal with the parties as it found them and do equity under the facts as they existed when the Intervention was filed and after positions were changed, and not as the facts were before the case was settled. When the intervention was filed, positions had already been changed. In order to obtain equity, intervenors "must do equity, and give effect to all equitable rights" of plaintiffs. Ga.Code, Section 37–104. The Court, having jurisdiction, must seek "to do complete justice" and "give full relief to all parties in reference to the subject matter of the suit." Ga.Code, Section 37–105. "Equity considers that done which ought to be done." Ga.Code, Section 37–106.

■ In short, in equity the Court must uphold the settlement and consent decree to the fullest extent practicable insofar as it relates to the bargain made between plaintiffs and Southern, and must award each plaintiff such seniority as a proper balancing of all the equities in the case requires, recognizing the equities and legal rights of both plaintiffs and Intervenors.

■ The Court therefore concludes that by the settlement agreement with plaintiffs, Southern employed all of the plaintiffs on October 1, 1974, and all plaintiffs are now employees with seniority standing of not less than that date.

D. *Specific Remedies*

■ 1. *Stewardesses Terminated Prior to July 1, 1975.*—Plaintiffs Hydrick, Lowe, Nelms, Scarboro and Sebo were terminated prior to the effective date of Title VII. While Hydrick and Lowe claim that special equities exist in their cases, they took no timely action to protect those equities

after Title VII became effective and it is unnecessary for the Court to deal specifically with those equities.

Since these plaintiffs were terminated and lost their seniority for causes which, at the time, were not unlawful, in the view of the Court the undertaking of the settlement agreement to reinstate them to seniority standing which they had lost lawfully was without legal foundation and was inequitable to Intervenors and their class who were displaced thereby.

To the extent, therefore, that Hydrick, Lowe, Nelms, Scarboro and Sebo were given retroactive seniority, the consent decree is modified to provide that their seniority shall date from October 1, 1974.

■ 2. *McArthur.*—Mrs. McArthur resigned on October 15, 1970, only upon actual threat of discharge. Shortly thereafter when she heard that Southern was changing its marriage policies she applied for reinstatement and she applied for reinstatement repeatedly thereafter and finally she took the lead in instituting the present proceedings. If Mrs. McArthur is given her full seniority her relative seniority standing will still not be inequitably high and most incumbent flight attendants will not be affected thereby, and Mrs. McArthur will have no greater seniority than is her just due. Accordingly, the provisions of the consent decree which awarded Mrs. McArthur seniority as of date of original hire are reaffirmed.

■ 3. *Barnwell, Collard, Ferrill, and Muller.*—By its interim temporary restraining order, the Court directed that these four plaintiffs be reinstated with seniority computed by taking time from date of hire to date of separation and adding thereto time from application for reinstatement to the present. They were not given seniority credit for time off the payroll between date of termination and date of application for reinstatement, but Southern was ordered to given them the benefit of the bargain which they made in the settlement agreement by paying them as of date of original hire. The Court remains of the opin-

ion that that solution as to these four plaintiffs remains equitable and the consent decree is modified accordingly with respect to them.

Collard and Muller, both terminated for pregnancy, assert that they should be given additional seniority, Collard because she applied for employment with Southern earlier, before making written application for reinstatement, and Muller because she applied to the union for reinstatement when the pregnancy rule was changed. Both assert that they should be given additional seniority credit as if they had been on pregnancy leave during portions of their time off the payroll.

It is not clear that Collard sought earlier reinstatement to flight status and Muller did not follow up her request to the union with timely charges. Neither filed charges when they were terminated for pregnancy. Both Collard and Muller, in the opinion of the court, now have equitable relative seniority. These claims are therefore denied.

■ 4. *Holland.*—There was no convincing evidence that Holland resigned for reasons other than that she feared that the job of her pilot husband with Southern might be prejudiced if she did not, and the Court finds that to have been the cause of her termination.

Accordingly, the consent decree is modified to provide that Holland shall have seniority consisting of time from date of hire to date of termination, plus time from application for reinstatement to the present; but she shall be paid as of date of original hire as provided in the consent decree.

■ 5. *Prouty.*—Prouty, as distinguished from Collard and Muller, was not terminated for pregnancy, but went on leave of absence. The court finds that Prouty did not show by a preponderance of the evidence that she was the victim of discrimination and that her failure to return to work at the end of her pregnancy leave was not voluntary.

Accordingly, the consent decree is modified to provide that Poruty's senior-

ity shall date from October 1, 1974, but she is entitled to the benefit of the bargain she made with Southern and shall be paid as of original date of hire.

6. *Effective dates of decree.*—This decree shall be effective immediately upon entry, but shall have no retroactive effect. All plaintiffs shall be entitled to bid upon a line of time upon the October 1975 flight schedules upon the basis of seniority as established herein. Holland may bid a line of time at the New Orleans base.

7. *Essential Dates.*—Dates relevant to seniority as herein established are as follows:

| | Date of Original Employment | Relevant Dates of Separation or Re-employment | Date of Application for Reinstatement |
|---|---|---|---|
| Barnwell | 12/ 1/61 | 3/31/68 | 8/19/74 |
| Collard | 3/15/65 | 3/ 7/68 | 9/ 3/73 |
| Hydricks | 12/27/50 | (reemployed) 10/ 1/74 | |
| Ferrill | 2/17/64 | 1/30/68 | 8/29/74 |
| Holland | 2/17/64 | 4/30/70 | 8/29/74 |
| Lowe | 8/19/63 | (reemployed) 10/ 1/74 | |
| McArthur | 3/ 4/68 | | |
| Muller | 10/ 1/60 | 5/19/69 | 2/15/74 |
| Nelms | 12/27/50 | (reemployed) 10/ 1/74 | |
| Prouty | 8/ 2/65 | (reemployed) 10/ 1/74 | |
| Scarboro | 2/16/61 | (reemployed) 10/ 1/74 | |
| Sebo | 9/17/62 | (reemployed) 10/ 1/74 | |

━━━━━◆━━━━━

8. *Pay status.*—The competitive seniority status of plaintiffs relative to other flight attendants shall be as provided above. However, plaintiffs are entitled to the benefit of their settlement with Southern and shall be paid by Southern and shall receive retirement benefits and duration of vacation (as distinguished from competitive choice of vacation schedule) based upon their original date of hire.

9. *Out of Town Expenses.*—The claims of Barnwell, Collard, Ferrill, Holland, Muller and Prouty for out of town expenses in November, 1974, are denied. In the view of the Court, inasmuch as the Court suspended their seniority status, Southern could not assign them to a permanent base until a vacancy occurred and was entitled to temporarily assign them to work wherever they were needed.

Likewise, Hydricks, Holland, Lowe, McArthur, Nelms, Prouty, Scarboro and Sebo were displaced from seniority standing as a result of previous orders of this Court, but, as stated above, this order shall be prospective only in effect and any claims for interim loss of pay resulting from loss of seniority as a result of court order, are denied.

10. *Attorney Fees.*—Plaintiffs claim additional attorney fees from Southern and/or Intervenors and their class. Intervenors claims attorney fees from Southern and/or the Unions. Southern claims contribution from the Union to any additional attorney fees which are awarded.

As found above, the Court finds no bad faith in the settlement agreement or in this litigation. Accordingly, with respect to attorney fees, the Court will leave the parties where it found them and all claims for the award of additional or further attorneys fees are denied.

11. All interlocutory orders are vacated and the consent decree heretofore entered, as modified by this final decree, is made the order of court.

12. No additional costs are due in this case and none are awarded. Let judgment issue in accordance with this decree.